## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **James Coleman,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Civil No. 12-cv-01352 (APM)** |
| ) | |
| **Jeh C. Johnson,** ) | |
| **Secretary of the** ) | |
| **Department of Homeland Security,** ) | |
| ) | |
| **Defendant.** ) | |

## <u>MEMORANDUM OPINION</u>

## I.      INTRODUCTION

Plaintiff James Coleman is a Production Specialist with the Secretary's Briefing Staff in the Department of Homeland Security.[1]  When a position came available to become a Supervisory Production Specialist, Plaintiff applied but was passed over in favor of two white, younger candidates.  Plaintiff now claims that he was discriminated against based on his race and age in violation of Title VII, 42 U.S.C. § 2000e-2, and the Age Discrimination in Employment Act, 29 U.S.C. § 631(a).[2]  Before the court is Defendant's Motion for Summary Judgment.  After examining the record, the court concludes that Defendant has presented a legitimate, non-discriminatory reason for not hiring Plaintiff, and that Plaintiff has failed to put forth evidence upon which a reasonable jury could conclude that Defendant's hiring decision was a pretext for discrimination.  The court therefore grants Defendant's Motion for Summary Judgment.

---

[1] Jeh C. Johnson substituted as Defendant for former Secretary of the Department of Homeland Security, Janet Napolitano.

[2] Plaintiff also alleged in his Complaint retaliation in violation of Title VII.  Compl., ECF No. 1, ¶¶ 50-59.  On January 14, 2014, the court granted Defendant's Motion to Dismiss as to that claim.  Op., ECF No. 18.

## II.     BACKGROUND

Plaintiff is a 54 year-old male who identifies as African-American.  Compl. ¶ 8.  Since March 2008, he has been employed as a GS-13 on the Department of Homeland Security's ("DHS") Secretary's Briefing Staff ("SBS"), which is within DHS's Office of the Executive Secretariat.  *Id.* ¶ 9.  "SBS prepares daily, in-depth briefings for the Secretary and Deputy Secretary for national and global events."  Heiser Decl., ECF No. 9-5, at 34.  Its mission is to "provide[ ] the Office of the Secretary timely, accurate, [and] relevant information that supports events, meetings, and decision making."  Rohner Suppl. Decl., ECF No. 33-7, at 3.

Plaintiff began his employment at SBS in 2008 as a Production Specialist.  Compl. ¶ 9.  His responsibilities included preparing briefing books that other DHS employees used to brief the Secretary.  Coleman Dep., ECF Nos. 33-1, 37-2, at 17.  Sometime between 2009 and 2010, Plaintiff temporarily functioned as "the *de facto* supervisory production specialist, ensuring that briefing books for the daily Secretarial briefings were complete."  Brought Decl., ECF No. 36-11, ¶ 4.  Plaintiff had a good rapport with his supervisor, SBS Director Boyden Rohner, who rated Plaintiff as an "exceeds expectations" performer in November 2010.  Rohner Dep., ECF Nos. 33-2, 36-8, & 37-1, at 27.

Rohner became the Director of SBS in April 2009.  Rohner Decl., ECF No. 9-2, ¶ 1.  At that time, SBS did not officially reside within DHS's Office of the Executive Secretariat ("ESEC") but was "detailed" to that office.  Rohner Suppl. Decl. ¶ 2.  By the beginning of 2010, however, SBS had been "formally transferred" to ESEC.  *Id.*  As part of the transition, Rohner sought to combine the positions of "briefer"—employees who directly briefed the Secretary—with the position of Supervisory Production Specialist (the "Supervisory Position")—employees who prepared the reports used to brief the Secretary.  *Id.* ¶ 3.  Prior to SBS's reorganization, Rohner, as Director of

SBS, was the only SBS employee to brief the Secretary, a concern that initiated the realignment. *Id.* ¶¶ 3-4.

In late 2009, Rohner convened a meeting, which Plaintiff attended, during which she delivered a PowerPoint presentation announcing her new vision for SBS, including the integration of the briefer and the Supervisory Position roles. Coleman Dep. at 25-27. According to Rohner, she explained that those in the integrated position would now be responsible for briefing the Secretary. Rohner Suppl. Decl. ¶ 5. Plaintiff disputes that Rohner articulated this vision for the Supervisory Position at the meeting. Coleman 2d Decl., ECF No. 36-4, ¶ 13.

In June 2010, Defendant posted Vacancy Announcement No. OS-20100328. Compl. ¶ 11. The Announcement described an opening for the Supervisory Position in SBS.[3] *Id.* Plaintiff applied and was interviewed for the position. *Id.* If selected, he would have been promoted from a GS-13 to a GS-14. *Id.* Because the position's responsibilities included briefing the Secretary, Plaintiff's interview included a mock briefing exercise. Coleman Dep. at 41. Plaintiff was not selected for the vacancy; nor was any other candidate. Compl. ¶ 11.

Afterwards, in an email to Rohner, Plaintiff acknowledged that he had performed poorly during the mock briefing portion of his interview. Heiser Suppl. Decl., ECF No. 33-5, at Ex. 3 ("I

---

[3] According to the Vacancy Announcement, which enumerated the Supervisory Position's responsibilities, the individual in that position "[d]irects the preparation of daily operations and intelligence briefings for the Secretary ensuring that the submissions are of the highest quality and are anticipatory of any questions the Secretary may ask"; "[a]ssists Production Specialists by prioritizing work, organizing materials, developing and applying basic analytical techniques and preparing final products for the Secretary's briefings"; and "[t]rains and mentors the briefers to ensure that they are equipped and prepared to deliver accurate, articulate, and meaningful briefs." Heiser Decl. at 5. The Vacancy Announcement indicated that preferred candidates have experience "[p]reparing in-depth briefings for national and/or global events"; "[d]eveloping written products for senior level management officials to include writing, editing, and coordinating briefing presentations"; and "[a]nalyzing information from various sources and prepar[ing] briefings and final products for senior level management." *Id.* at 6. The following preferred Knowledge, Skills, Abilities, or Other Characteristics ("KSAOs") were also listed in the Vacancy Announcement: "[s]kill in communicating with senior level management officials and developing and editing written products"; "[a]bility to perform in a fast-paced time-sensitive environment leading a team and coordinating multiple processes"; and "[a]bility to liaison with communities of national intelligence and law enforcement in order to coordinate critical issues of national importance." *Id.*

was upset and I whole heartedly agreed with your assessment of my interview (immediately after the interview I was disappointed).").  Plaintiff asked Rohner for her assistance in improving his briefings skills:  "I only ask that you and I to have a mock briefing (you and I alone).  Where we cover the articles in the briefing book based on the way you think the items should be briefed, why you thought it should be briefed in that manner and how you came to the conclusions that you did."  *Id.*  Rohner was receptive to Plaintiff's request and "offered to help [him] . . . in practicing his briefing."  Rohner Dep. at 72-73.

In Fall 2010, Defendant posted Vacancy Announcement No. 362712, re-advertising two vacancies for the same Supervisory Position.  Coleman Dep. at 40-41.  Plaintiff reapplied and received an interview.  *Id.* at 51.  Candidates were again tasked with performing a mock briefing during the interview.  Rohner Dep. at 67.  According to Rohner, "[Plaintiff] did not significantly improve from his performance in early 2010."  Rohner Decl. ¶ 7.  Plaintiff admitted that, even though he performed poorly during his first mock briefing, Heiser Suppl. Decl. at Ex. 3, all he did to prepare for his second mock briefing was to "familiarize[ ] [himself] with certain articles that are presented in front of the Secretary," Coleman Dep. at 61-62.

Plaintiff was not selected for the position.   Instead, a selection board—comprised of Rohner, Donald Swain (Deputy Executive Secretary), and a Ms. Blackwell, Rohner EEO Decl., ECF No. 9-3, at 2; Rohner Dep. at 68—unanimously agreed to select two other candidates: John Destry and Alan Eckersley (the "Selected Candidates"), Heiser Decl. at 12.  Destry was employed by the Defense Intelligence Agency ("DIA") when he applied to SBS.  Destry Dep., ECF No. 33-4, at 12.  While at DIA, Destry consistently briefed, Destry Decl., ECF No. 33-6, ¶ 4, and provided "daily morning desk-side briefings on current intelligence" to senior-level officials, Rohner Sealed Decl., ECF No. 8-2, at Ex. 2.  He also previously served as a platoon commander in the Marines

Corps.  *Id.*  Eckersley worked for the Joint Chiefs of Staff Directorate for Intelligence when he applied for the position.  *Id.* at 9.  At that time, he held the rank of Lieutenant Colonel and had experience managing intelligence-related assignments.  *Id.*  Eckersley also had experience conducting briefings—he "[p]resent[ed] operations and recommendations to senior leaders."  *Id.* at 10.

In addition to having briefing experience, the Selected Candidates also performed well during the mock briefing portion of their interviews.  According to Rohner, "[b]oth [the Selected Candidates] performed exceptionally during the interview and during the required briefing portion. Not only did both candidates have strong supervisory and managerial experience, but both candidates already had recent experience briefing senior officials on a day-to-day basis."  Rohner EEO Decl. at 9.

## III.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute over a material fact is genuine when "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Id.* at 247-48.

In any dispute of fact, the court must "[review the evidence] in the light most favorable to the nonmoving party and . . . draw all reasonable inferences in favor of the nonmoving party."  *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011) (citing *Anderson*, 477 U.S. at 255).  Parties may cite to "materials in the record" or "show[ ] that the materials cited do not establish the absence

or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A)-(B).  Summary judgment is properly

granted if the plaintiff, "after adequate time for discovery and upon motion, . . . fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986).   Therefore, the district court must determine "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

## IV.    ANALYSIS

Plaintiff alleges race and age discrimination under Title VII and the ADEA, respectively.

Because Plaintiff's two discrimination claims stem from the same adverse employment decision,

the court analyzes both of these claims together.  *See St. John v. Napolitano*, 20 F. Supp. 3d 74,

102 (D.D.C. 2013) (citations omitted) ("The ADEA inquiry is substantially identical to the

Title VII inquiry in that both follow the *McDonnell Douglas* framework, thus the rationale for

rejecting the plaintiff's Title VII claim apply equally to his ADEA claim."); *see also Chowdhury

v. Schafer*, 587 F. Supp. 2d 257, 263 (D.D.C. 2008) (noting that the same approach "applies to

both Title VII and ADEA claims").

### A.    Framework for Analyzing Title VII Race Discrimination and ADEA Age Discrimination Claims

Title VII of the Civil Rights Act explicitly prohibits discriminatory labor practices and

provides that "[a]ll personnel actions affecting employees or applicants for employment . . . in

executive agencies . . . shall be made free from any discrimination based on race, color, religion,

sex, or national origin."  42 U.S.C. § 2000e-16(a).  To prove a Title VII violation, a plaintiff must

demonstrate that the employer's actions were "more likely than not based on the consideration of

impermissible factors."  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  He may

do so by presenting "direct evidence, and absent direct evidence, . . . by establishing a prima facie case under the burden-shifting framework established in *McDonnell Douglas*." *Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F. Supp. 641, 665 (D.D.C. 1997).

Where "an employer has asserted a legitimate, non-discriminatory reason for the [hiring] decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). "[O]nce the employer asserts a legitimate, non-discriminatory reason, the question whether the employee actually made out a prima facie case is 'no longer relevant' and thus 'disappear[s]' and 'drops out of the picture.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993). Consequently, the burden shifts back to the plaintiff and the central inquiry becomes: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Id.* (citations omitted).

The plaintiff may carry this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256 (citations omitted). In other words, the plaintiff must show that the reason presented by the defendant was a "pretext." *Brady*, 520 F.3d at 495. To show an employer's pretext, a plaintiff can offer either qualifications evidence, *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (explaining that "when an employer says it made a hiring or promotion decision based on the relative qualifications of the candidates, a plaintiff can directly challenge that qualifications-based

explanation"), or other "sufficient evidence to show that [the defendant's] reason for [not] selecting [the plaintiff] was pretextual," *Grosdidier v. Broad. Bd. of Govs.*, 709 F.3d 19, 25 (D.C. Cir. 2013).

Here, Defendant offered a non-discriminatory reason for not hiring Plaintiff:  He was not the best qualified candidate for the position.  Def.'s Mot. Summ. J., ECF No. 33, at 9; Rohner EEO Decl. at 9 ("Both [the Selected Candidates] performed exceptionally during the interview and during the required briefing portion."); Swain Dep., ECF No. 33-3, at 46 ("I don't think that [Plaintiff] did as well as the [Selected Candidates]. . . .  [I]t is about [who is] best qualified for the position. . . .  Best qualified; resume[;] interview[;] mock brief.").

Attempting to demonstrate that Defendant's explanation is a pretext, Plaintiff advances three arguments: (1) Plaintiff "was the most qualified candidate," Pl.'s Opp'n to Def.'s Mot. Summ. J., ECF No. 36, at 18 [hereinafter Pl.'s Opp'n]; (2) "no records were kept of anything having to do with the selection process," *id.* at 19; and (3) "Rohner concocted an interviewing scheme that was laden with highly subjective considerations," *id.*  The court is not persuaded by any of these arguments.

## B.  Relative Qualifications Claim

Plaintiff contends that "[t]he record convincingly shows that . . . by a wide margin, [he] was the most qualified candidate for the [Supervisory Position]." *Id.* at 18.  He asserts that "there was a substantial 'qualifications gap' between Plaintiff and the successful candidates, that should have tipped the balance in Plaintiff's favor." *Id.* at 22.  Defendant counters that "the two selectees were more qualified than [Plaintiff] in the briefing skill set that management considered to be a 'very important' aspect of the position, and were equally if not more qualified than [him] in organizing and gathering intelligence information."  Def.'s Reply in Supp. of Mot. Summ. J., ECF

No. 37, at 10 [hereinafter Def.'s Reply].  Thus, Defendant argues, Plaintiff "cannot claim superior qualifications sufficient to support an inference of pretext."  *Id.* at 9.  The court agrees with Defendant, finding that Plaintiff has failed to show that there is a genuine dispute of fact as to whether he was "substantially more qualified" than the two Selected Candidates.

### 1.    *Legal Standard*

A plaintiff may demonstrate that an employer's proffered non-discriminatory reason is pretextual by offering evidence regarding his qualifications in comparison to those of the individual or individuals selected.  *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006).  Courts, however, should not second-guess a hiring decision between qualified candidates.  As our Court of Appeals has stated, courts "will not reexamine governmental promotion decisions where it appears the Government was faced with a difficult decision between two qualified candidates." *Stewart v. Ashcroft*, 352 F.3d 422, 430 (D.C. Cir. 2003); *see also Adeyemi*, 525 F.3d at 1227 (citation omitted) (internal quotation marks omitted) (explaining that "[i]n cases where the comparative qualifications are close, a reasonable jury would not usually find discrimination because the jury would assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call").  For that reason, although "a disparity in qualifications, standing alone, can support an inference of discrimination," the inference is only appropriate "when the plaintiff is 'markedly more qualified,' 'substantially more qualified,' or 'significantly better qualified' than the successful candidate."  *Hamilton v. Geithner*, 666 F.3d 1344, 1352 (D.C. Cir. 2012) (citations omitted); *see also Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006) ("In order to justify an inference of discrimination, the qualifications gap must be great enough to be inherently indicative

of discrimination."). Thus, for the plaintiff to prevail, the record must show that the plaintiff's

qualifications were clearly superior to those of the successful candidate or candidates.[4]

>    2.    *Briefing the Secretary Was an Important and Clear Responsibility of the*
>         *Supervisory Position*

Before considering the candidates' qualifications, the court must first determine what were

the duties and responsibilities of the job at issue. In this case, that means the court must examine

whether the Supervisory Position's duties included briefing the Secretary, a point about which the

parties disagree. Plaintiff focuses on the Vacancy Announcement, arguing that it does not

explicitly state that briefing the Secretary was among the Supervisory Position's responsibilities.

*See* Pl.'s Opp'n at 18 ("[N]either the job description nor the vacancy announcements anywhere

explicitly state that personally delivering daily briefs to the DHS Secretary is a major or essential

job function."). He argues that Plaintiff's "substantial experience was ignored and supplanted with

the phantom daily briefing requirement." *Id.* at 23. Defendant, on the other hand, contends that

the Vacancy Announcement's use of the words "notification, coordination, and synchronization"

to describe the job's "core functions," Heiser Suppl. Decl. at Ex. 1, made clear that briefing the

Secretary was an essential part of the job. Defendant relies on Rohner's testimony that the

"alternate terms" used were intended to "capture the briefing duties." Rohner Suppl. Decl. ¶ 6.

"[T]he term synchronization," Defendant argues, "was intended by . . . Rohner to be synonymous

---

[4] *Compare Hamilton*, 666 F.3d at 1353-54 (denying summary judgment for the defendant where the plaintiff earned two master's degrees in public health and worked within the federal government for 19 years, while the selected candidate had no college degree and only eight years of work experience), *and Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1295-97 (D.C. Cir. 1998) (denying summary judgment for the defendant where the plaintiff earned a master's degree and worked in a pharmacy for 19 years, while the selected candidate had no college degree and volunteered for two months stocking shelves at a pharmacy), *with Grosdidier*, 709 F.3d at 25 (granting summary judgment for the defendant where, although the plaintiff "had more experience as an editor," "the evidence . . . showed that [the selected candidate] had more internet and television broadcasting experience"), *and Porter v. Shah*, 606 F.3d 809, 815-17 (D.C. Cir. 2010) (granting summary judgment on one count where the plaintiff had no law degree and had drafted one appeal, while the selected candidate earned a law degree and practiced law for approximately ten years).

with the actual delivery of the daily brief." Def.'s Reply at 7 (citing Rohner Suppl. Decl. ¶ 6, Ex. 1).

On this point, the court agrees with Plaintiff. It is hard to fathom how an ordinary person would view "notification," "coordination," and "synchronization" as synonyms for "briefing," a word whose meaning is clear and unambiguous. Indeed, nowhere does the Vacancy Announcement state in clear terms that a major duty of the Supervisory Position would be orally briefing the Secretary. *See* Heiser Suppl. Decl. at Ex. 1.

The Vacancy Announcement's imprecision does not, however, carry the day for Plaintiff. *See Jackson*, 496 F.3d at 708 (explaining that "job descriptions are often phrased in general terms, and employers then make the ultimate hiring decision in light of more specific factors—such as their strategic priorities and goals at the time, the strengths and weaknesses of the applicant pool, and the overall skills of and gaps in their existing workforce, among many other factors"). The record contains other, undisputed evidence establishing that an essential duty of the Supervisory Position was to orally brief the Secretary. That same evidence also unquestionably shows that Plaintiff knew that briefing the Secretary was a duty of the Supervisory Position.

The vacancy at issue was the *second* posted vacancy for the Supervisory Position. Plaintiff applied for the first vacancy and received an interview in June 2010, during which he was asked to perform a mock briefing. Coleman Decl., ECF No. 36-5, ¶ 7. Although Plaintiff claims to have been "confused" as to why he was asked to perform a mock briefing during the first interview, asserting that he was unaware before the interview that briefing the Secretary was a duty of the Supervisory Position, Coleman 2d Decl. ¶¶ 9, 17, any confusion surely was dispelled before his second interview. Plaintiff admitted at his deposition that, following his first interview, Rohner personally told him that briefing was among the Supervisory Position's duties. Plaintiff testified:

"In June, after the first interview, [Rohner] mentioned that I needed to work on my briefing skills. I informed her that I thought the position was production supervisor.  She informed me after the [first] interview *the position was changed to production supervisor/briefer*."  Coleman Dep. at 54-55 (emphasis added).  Plaintiff agreed that he understood from this conversation that the Supervisory Position would now require direct briefing of the Secretary.  *Id.* at 55 (answering "yes" when asked "did you then form the impression that briefing would be a responsibility of the position").

Additionally, the evidence is undisputed that, after his first interview, Plaintiff acknowledged that he had performed poorly during his mock briefing and, as a result, asked Rohner to help him improve his briefing skills.  On April 23, 2010, Plaintiff emailed Rohner and wrote, "I was upset and I whole heartedly agreed with your assessment of my interview (immediately after the interview I was disappointed)."  Heiser Suppl. Decl. at Ex. 3.  Plaintiff then asked Rohner for her assistance in improving his briefings skills: "I only ask that you and I to have a mock briefing (you and I alone).  Where we cover the articles in the briefing book based on the way you think the items should be briefed, why you thought it should be briefed in that manner and how you came to the conclusions that you did.  Not asking you to adjust your schedule or anything, but for us to meet a few times to see how I progress."  *Id.*; *see also* Rohner Dep. at 72 (testifying that, after the first interview, she had a conversation with Plaintiff explaining that he needed to "improve[ ] his briefing skills or abilities in preparation for the second interview," so she "offered to help [him] . . . in practicing his briefing").  Plaintiff's expressed desire to improve his briefing skills plainly shows that briefing the Secretary was an essential duty of the Supervisory Position and that he understood that to be so.  Why else would he have acknowledged his poor performance and have asked for assistance in improving his briefing skills?

Other evidence also establishes that the Supervisory Position included among its duties briefing the Secretary.  Swain, a member of the selection board for the position, emphasized that briefing was a key responsibility of the Supervisory Position.  Swain Dep. at 46 ("[T]he briefing is a very important part of this position.  You are sitting in front of a Cabinet level official briefing. It is very important.").  Other candidates who interviewed for the position understood the same. One such candidate, Nathaniel Brought, acknowledged that Rohner changed the Supervisory Position's duties to include briefing the DHS Secretary.  Brought Decl. ¶ 3.  And John Destry, one of the Selected Candidates, stated that "[he] was not surprised by the mock briefing [portion of the interview] because [he] assumed, based on the title of the organization (Secretary's Briefing Staff) and the vacancy announcement, that one of the main duties of the position would be to brief the Secretary."  Destry Decl. ¶ 3.  Destry, who accepted the Supervisory Position, would go on to provide "over 40 in-person briefings to the Secretary" during fiscal year 2011.  *Id.* ¶ 5.

The court finds, based on the record of evidence, that there is no genuine dispute of material fact that briefing the Secretary was an important, if not *the most* important responsibility of the Supervisory Position.  Thus, the question of whether Plaintiff was "substantially more qualified" for the Supervisory Position turns on whether his abilities and experience made him more qualified to perform that key function relative to the Selected Candidates.  The court addresses that question next.

       3.     *Plaintiff Has Failed to Show that He Was Substantially More Qualified Than the Selected Candidates*

No one disputes that Plaintiff performed well and received high marks in his job as a GS-13 Production Specialist, a position he held for approximately two years before interviewing for the Supervisory Position.  In this capacity, Plaintiff "ensure[d] his team reviewed products for timeliness, accuracy, and relevance and ensured they routinely made recommendations when they

did not meet SBS standards."  2009 Year Performance Review, ECF No. 11-5, at 3.  According to

Rohner, Plaintiff fulfilled his duties well.  Coleman EEO Decl., ECF No. 9-6, ¶ 39 ("[Plaintiff's]

greatest strength is his sense of responsibility and personal accountability.").   Rohner rated

Plaintiff an "exceeds expectations" performer and recommended him for a $2,659 bonus.  Coleman

Decl. ¶¶ 2-3.

But, as Plaintiff admitted, his job as a Production Specialist did not require him to use or

develop skills critical to the task of briefing a Cabinet-level officer.  Coleman Decl. ¶ 4 ("Briefing

skills were not a part of the production specialist . . . position").   As a Production Specialist,

Plaintiff *attended* briefings of the Secretary, but he did not *conduct* them.  Rather, he assisted with

the preparation of the books used by briefers.  Coleman Dep. at 17.  In fact, Plaintiff referred to

his role as an "instrument[ ] of preparation."  *Id.*

Plaintiff's lack of briefing experience was evident during the mock briefing portions of his

Supervisory Position interviews.  Plaintiff acknowledged that he did not perform well during his

first mock briefing.  *See* Heiser Suppl. Decl. at Ex. 3 (writing "I was upset and I whole heartedly

agreed with your assessment of my interview (immediately after the interview I was disappointed)"

and asking Rohner to help him improve his briefing skills).  And yet, he prepared minimally for

his second mock briefing before again performing poorly.  Coleman Dep. at 62 (stating that all he

did to prepare was "familiarize[ ] [himself] with certain articles that are presented in front of the

Secretary").  According to Rohner, Plaintiff "did not significantly improve from his performance

in early 2010."  Rohner Suppl. Decl. ¶ 7.  Swain agreed, declaring, "I don't think that [Plaintiff]

did as well as the [Selected Candidates]."  Swain Dep. at 46.  Although Plaintiff disputes that his

second mock briefing performance was inferior to the Selected Candidates, Pl.'s Response to

Def.'s Statement of Undisputed Material Facts, ECF No. 36-1, ¶ 20, he has offered no evidence to support that assertion.

Nor has Plaintiff established a genuine dispute of material fact that the Selected Candidates were substantially less qualified than him.[5]  Both Selected Candidates had significant experience briefing officials in the intelligence community.  While at DIA, Destry consistently briefed senior-level officers.  Destry Decl. ¶ 4.  He authored "intelligence summaries," provided "daily morning desk-side briefings on current intelligence" to senior-level officials, and consolidated and presented "metrics" for a comprehensive intelligence production list.  Rohner Sealed Decl. at Ex. 2.  Further, he supervised and trained over 100 Marines as a Platoon Commander in the Marine Corps.  *Id.*

Eckersley was, according to his resume, an "Accomplished Intelligence Operations specialist with a strong record of achievement managing intelligence operations and coordinating operations among intelligence agencies and senior leadership as a Lieutenant Colonel in the US Army and as a civilian employee for the Federal government."  *Id.* at Ex. 3.  In his work at the Joint Chiefs of Staff Directorate for Intelligence, Eckersley "[p]resent[ed] operations and recommendations to senior leaders"—in other words, he briefed them.  *Id.*  In this capacity, he also would "[n]ominate, validate and prioritize all intelligence-related assignments within the Global Command and Control System (GCCS)"; "[c]onduct identification and prioritization for the GCCS Integrated Imagery and Intelligence" system; and "[f]acilitate joint intelligence fusion

---

[5] Rohner and Swain both testified that the Selected Candidates were, in fact, more qualified for the position than was Plaintiff.  *See* Rohner EEO Decl. at 9 ("After interviewing the candidates the selection board unanimously agreed on two candidates . . . .  Both candidates performed exceptionally during the interview and during the required briefing portion.  Not only did both candidates have strong supervisory and managerial experience, but both candidates already had recent experiences briefing senior officials on a day-to-day basis.  [Plaintiff]'s briefing did not improve at all from the first interview."); Swain Dep. at 46 ("I don't think that [Plaintiff] did as well as the [Selected Candidates]. . . .  [I]t is about [who is] best qualified for the position. . . .  Best qualified; resume[;] interview[;] mock brief.").

and wartime solutions from national to tactical levels and between the DoD and the Intelligence Community." *Id.* And he collaborated with, among others, the Office of the Director of National Intelligence. *Id.*

For obvious reasons, Plaintiff does not attempt to make his case based on relative briefing experience and skill. Instead, he emphasizes his superior performance as a Production Specialist and points to his "functioning as the *de facto* [Supervisory Position] as defined in the job description, for more than a year and . . . exceed[ing] expectations in doing so." Pl.'s Opp'n at 21. In employment discrimination cases, courts do consider whether plaintiffs previously served in the position sought, but that fact is not dispositive. *See, e.g., Barnette v. Chertoff*, 453 F.3d 513, 518 (D.C. Cir. 2006) ("[W]e admonished the district court for second-guessing the agency's decision to pass over the plaintiff in favor of another applicant notwithstanding that the plaintiff had previously served in the position he sought in an acting capacity and the selectee had not."); *St. John*, 20 F. Supp. 3d at 82, 103-04 (granting summary judgment to the defendant on race and age discrimination claims where the plaintiff served as "Acting Director" for one year before another candidate was selected to be the "Director" on a full-time basis).

Here, Plaintiff's "functioning as the *de facto* [Supervisory Position]" does not create a genuine issue of material fact as to whether he was "substantially more qualified" than the Selected Candidates because the "*de facto*" role Plaintiff fulfilled differed significantly from the new position that Rohner created. Plaintiff only performed some duties of the Supervisory Position before Rohner reorganized SBS, *see* Coleman Dep. at 31, and he did not perform any briefing. The additional and critical job component of briefing rendered Plaintiff less qualified than the Selected Candidates, notwithstanding his commendable performance as a Production Specialist, a

position that required no briefing skills or experience.  Therefore, Plaintiff's argument regarding his service as the *de facto* Supervisory Position is unavailing.

Plaintiff relies heavily on *Hamilton v. Geithner* in arguing that he was "substantially more qualified" than the Selected Candidates.  *See* Pl.'s Opp'n at 20-22.  However, that reliance is misplaced.  In *Hamilton*, despite the plaintiff having a pertinent master's degree and nineteen years of relevant work experience, the defendant selected a candidate who had no college degree and only eight years of relevant work experience.  666 F.3d at 1353.  There is no comparable qualifications gap here.

In short, the court finds that a reasonable juror could not infer from the evidence that the legitimate, non-discriminatory reason offered by Defendant for selecting other candidates over Plaintiff—that the Selected Candidates were more qualified—was pretextual.  Plaintiff simply has not shown that he was "markedly more qualified," "substantially more qualified," or "significantly better qualified" than the Selected Candidates.

### C.      Lack of Contemporaneous Documentation Claim

Plaintiff also argues that the lack of contemporaneous documentation allows an inference that Plaintiff's non-selection was pretextual.  Pl.'s Opp'n at 24-25.  He asserts that "no records were kept of anything having to do with the selection process, other than U.S.A. Jobs-formatted resumes from the candidates and their KSAO questionnaires"; "[t]he questions asked were not retained"; "[n]o notes were retained by the selection panel, even though notes apparently were taken during the interview process"; "[n]o records were maintained concerning the selection panel's deliberations and how the candidates were ranked or scored during or immediately following the interviews"; and "[n]o decision-making matrix was prepared."  *Id.* at 19-20.  Defendant does not dispute the lack of contemporaneous documentation.  Rather, it contends that

"the absence of interview notes does not support an inference that [Plaintiff] performed better in his interview than [the Selected Candidates] or that he was significantly more qualified for the position than those two individuals." Def.'s Reply at 16. The court agrees with Defendant.

"[T]he absence of contemporaneous evidence is hardly unusual; employers ordinarily do not 'publish a contemporaneous statement of reasons every time they make a hiring or firing decision.'" *Adeyemi*, 525 F.3d at 1228 (quoting *Jackson v. Gonzales*, 496 F.3d 703, 710 (D.C. Cir. 2007)). In some cases, however, courts have found that a lack of contemporaneous evidence such as interview notes may allow for "a permissive inference [in favor of the plaintiff] bounded by constraints of reason." *Grosdidier*, 709 F.3d at 28. In *Grosdidier*, the Court of Appeals determined a "reasonable inference" that the plaintiff performed well during her interview could be drawn from the fact that members of the interview panel destroyed their notes. *Id.* However, the Court of Appeals upheld a grant of summary judgment in favor of the defendant because, "even if a factfinder could reasonably infer that the destroyed notes contained information that might be favorable to [the plaintiff], favorable evidence is not in all instances equivalent to evidence that would permit [the plaintiff] to survive summary judgment." *Id.* (citation omitted). "The inference [the plaintiff] requires must be sufficient to create a genuine issue of material fact, not simply one that lends some support to her pretext contention." *Id.*

Here, the absence of contemporaneous documentary evidence is not enough to create a genuine dispute of material fact about whether Defendant's hiring decision was discriminatory. There is simply nothing in the record—not even Plaintiff's own self-assessment—that would support the inference that he demonstrated strong briefing skills or performed well during the mock briefing portion of his second interview, or that his lack of briefing experience and skills was not the actual reason for his non-hiring. Thus, the lack of documentation does not create a genuine

dispute of fact as to whether Defendant's non-discriminatory reason for not hiring Plaintiff is "unworthy of credence." *See Burdine*, 450 U.S. at 256.

### D.      Subjective Criteria Claim

Plaintiff's final argument is that his non-hiring was discriminatory because "[Defendant's] decision-making process involved . . . highly subjective considerations." Pl.'s Opp'n at 24. In addition to the mock briefing exercise, he points to other "subjective and non-job-related questions"—such as "'what was the most recent book that you read'"—as evidence that the hiring process was susceptible to discriminatory practices. *Id.* at 19. But the subjective nature of the interview process here creates no reasonable inference of discriminatory hiring.

To be sure, "courts traditionally treat explanations that rely heavily on subjective considerations with caution." *Aka*, 156 F.3d at 1298. The Court of Appeals, for instance, has found reliance on subjective criteria to be evidence of pretext where selection boards focused on irrelevant job qualifications. *See, e.g.*, *Hamilton*, 666 F.3d at 1356-57 (citation omitted) (reversing denial of summary judgment in favor of the defendant on race and sex discrimination claims where the interviewer "appear[ed] to have based his assessment of [the plaintiff's] interview performance in part on her 'presentation of self,' . . . a highly subjective criterion that a jury could well view as 'lend[ing]' itself quite 'readily' to gender-based or 'racially discriminatory abuse'"). However, "[w]hile it is true that subjective criteria lend themselves to racially discriminatory abuse more readily than do objective criteria, there nonetheless are situations where employment decisions can, must, and should be made on the basis of subjective criteria." *Harris v. Grp. Health Ass'n*, 662 F.2d 869, 873 (D.C. Cir. 1981).

Here, the court finds it reasonable—and Plaintiff has offered no evidence to the contrary— that Defendant chose to evaluate a candidates' briefing skills through a mock briefing exercise

where the position at issue required regular briefings of a Cabinet Secretary.  Defendant was under no compulsion to rely solely on a candidate's paper application and objective interview questions.  Though a mock briefing exercise by its nature invites a subjective assessment, at least here, it also enabled the selection committee to evaluate how a candidate might deliver a critical briefing to, or respond to aggressive questioning by, the Secretary.  There is nothing inherently improper about using such a tool to test a candidate and to compare him to other candidates.  And there is no evidence on this record to reasonably infer that the mock exercise here was conducted in a discriminatory manner or for a discriminatory purpose.

*          *          *

Finally, Plaintiff argues that "combining superior qualifications with other evidence"— namely, the lack of contemporaneous documentary evidence and the subjective quality of the interview process—"undermines [Defendant's] proffered explanation" and could support a reasonable jury's conclusion that the explanation was pretextual.  Pl.'s Opp'n at 23.  The court disagrees.  Plaintiff did not, as he claims, possess "superior qualifications," such that, viewed with other evidence, a reasonable jury could make a finding of pretext.  The record here is undisputed that (1) a major duty of the revised Supervisory Position was regular oral briefings of the Secretary; (2) Plaintiff lacked skills and experience in briefing; (3) Plaintiff did not turn in a superior performance during either of his mock briefings; (4) the Selected Candidates had greater experience briefing high-level government officials than did Plaintiff; and (5) one of the Selected Candidates (the other did not accept the position) went on to brief the Secretary on dozens of occasions.

Further, this is not a case in which a plaintiff has presented any evidence of animus.  To the contrary, Plaintiff presented evidence that he received strong performance appraisals from his

supervisor.  That he was considered a second time for the Supervisory Position even though, by his own admission, he performed poorly during his first interview, indicates that his supervisors did not have animus towards him.

In short, Plaintiff has failed to show that there is a genuine dispute of fact that Defendant's proffered reason for his non-hiring was a pretext for race or age discrimination.

## V.    CONCLUSION

For the foregoing reasons, and based on the record before it, the court grants Defendant's Motion for Summary Judgment.  A separate Order accompanies this Memorandum Opinion.

Dated:  August 11, 2015                                          Amit P. Mehta
                                                                                  United States District Judge